# United States Court of Appeals
## For the First Circuit

No. 15-2061

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID ALCANTARA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

Molly Kapstein Cote on brief for appellant.
Donald C. Lockhart, Assistant United States Attorney, and Peter F. Neronha, United States Attorney, on brief for appellee.

September 19, 2016

**HOWARD**, **Chief Judge**. Defendant-Appellant David Alcantara was convicted, after a jury trial, of conspiracy to commit bank fraud and conspiracy to pass counterfeit currency. Alcantara now challenges these convictions, raising various evidentiary issues and one purported instance of prosecutorial misconduct. Finding each of Alcantara's claims meritless, we affirm.

## I.

To provide context, we describe the relevant facts supported by the evidence at trial. In December 2009, Alcantara and others set out to steal money from a Citizens Bank account belonging to a car-wash business. One of the co-conspirators was a teller at the bank. Another arrived at the bank posing as an agent of the car-wash company. The second co-conspirator approached the compromised teller and presented a false passport. The funds were successfully transferred from the car wash's account to a fraudulent account in the name of Hernandes Realty. Shortly thereafter, two other confederates liquidated much of the funds through a series of cashiers' checks.

Just weeks later, on January 19, 2010, Alcantara met with a person — who, unbeknownst to Alcantara, was an undercover government agent — about the possibility of obtaining fake drivers' licenses. During the meeting, Alcantara indicated that he needed the licenses in "four or five days," which did not leave the agent

enough time to prepare them. Alcantara told the agent that the two might be able to work together "for the next round."

The very next day, Alcantara perpetrated a second bank fraud, this time from Bank of America. To execute the scheme, Alcantara provided two co-conspirators with false temporary licenses and instructed them to open accounts. The accomplices later transferred funds into these accounts. Unfortunately for Alcantara, however, neither co-conspirator was successfully able to withdraw the money. One was arrested, and the other fled after hearing what he thought was an alarm.

On January 24, Alcantara had another conversation with the undercover agent. During this call, Alcantara asked the agent whether he knew anyone who worked at a bank. The two spoke for a third time on January 27, again discussing the possibility of the agent preparing fake licenses.

In February 2010, Alcantara became involved in a scheme to pass counterfeit money. Essentially, the plan was to use counterfeit bills to purchase inexpensive items in various retail stores, receiving change in authentic currency. Alternatively, the conspirators also purchased more expensive items, returning them shortly thereafter for real currency. On February 23, Alcantara drove to a mall in Farmington, Connecticut with his brother Urias and other co-conspirators. Alcantara distributed counterfeit $100 bills to the group, which the others then

- 3 -

attempted to pass.  Ultimately, Urias Alcantara was caught and arrested in possession of seventeen counterfeit $100 bills.  Before his brother's apprehension, Alcantara unsuccessfully attempted to alert the group that the police were approaching.

On March 4, the Secret Service visited a T-Mobile store where the conspirators had passed some of the counterfeit bills.  The next day, one member of the group texted Alcantara to inform him of this development.  He further indicated that the agents planned to return to the store to speak with the manager as well as review records and camera footage.  Alcantara was arrested eleven days later, on March 15, 2010, at JFK International Airport.

## II.

Alcantara raises a number of issues on appeal, namely, (1) various unpreserved evidentiary challenges; (2) two arguably preserved evidentiary challenges; and (3) an unpreserved prosecutorial misconduct claim.

### A.

Alcantara identifies five purported evidentiary errors that he concedes he failed to raise below.  Our review accordingly is for plain error.  United States v. Peña-Santo, 809 F.3d 686, 694 (1st Cir. 2015). This standard is an "exacting" one, requiring Alcantara to establish that "(1) there was an error, (2) which was clear or obvious, (3) that affected his substantial rights, and

- 4 -

(4) also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id.

### 1.

Alcantara first takes aim at various references to "luxury vehicles" in the trial transcript, as well as a photograph of his Bentley that was entered into evidence. According to Alcantara, the "cumulative effect" of this evidence was to bias the jury against him due to his "lavish lifestyle."

Contrary to Alcantara's contention, the cited testimony constituted probative evidence. Multiple witnesses testified that they knew Alcantara by his Bentley. Such testimony was admissible to establish the witnesses' knowledge of the defendant. Alcantara's response that "[i]dentity was not an issue in this case" is beside the point. See Old Chief v. United States, 519 U.S. 172, 186 (1997) (citing the "familiar, standard rule" that a defendant "may not stipulate or admit his way out of the full evidentiary force of the case"). Other witnesses, who were co-conspirators in Alcantara's criminal plots, testified that he drove a Lexus during the course of the conspiracy, including to meetings and bank branches. This testimony was admissible as "intrinsic to the crime[s] for which [Alcantara was] charged and [] on trial." United States v. DeSimone, 699 F.3d 113, 124 (1st Cir. 2012).

Alcantara's alternative argument that, even assuming the challenged evidence was relevant, it was inadmissible under Federal Rule of Evidence 403, fares no better. Alcantara points to twenty-one references to luxury vehicles, in addition to the photograph of his Bentley, in a trial transcript that spans hundreds of pages. Moreover, several of these references took place during defense counsel's cross-examinations and closing argument. Finally, the mentions of luxury vehicles were generally matter-of-fact statements that Alcantara was known for driving a Bentley or that he drove a Lexus on certain occasions. There was nothing particularly inflammatory about them, such that the probative value of the testimony would be "substantially outweighed by a danger of . . . unfair prejudice." See Fed. R. Evid. 403. Accordingly, it is doubtful that the district court erred at all, and it certainly did not commit plain error, by declining to exclude this evidence sua sponte.

**2.**

Alcantara's second claim of evidentiary error runs along similar lines. He argues that a handful of references to his wearing a New York Yankees baseball cap prejudiced the jury (which he assumes to have been composed of Boston Red Sox fans) against him. As an initial matter, all but two of the cited references occurred during defense counsel's cross-examination. In any event, this testimony, like the references to luxury vehicles

- 6 -

discussed above, was relevant to the witnesses' knowledge of Alcantara and his appearance. Any possibility of unfair prejudice was ameliorated when the district court explicitly instructed the Rhode Island jury not to hold Alcantara's wearing of a Yankees hat against him.

### 3.

Alcantara next takes issue with the admission of certain evidence relating to illegal activity by his brother Urias. This argument proceeds from the erroneous assumption that the government failed to connect Alcantara to his brother's misconduct.

The evidence in question consisted of (1) two photographs of Urias with counterfeit money and (2) testimony regarding Urias's arrest for passing counterfeit bills at the Farmington mall. With respect to the latter issue, the government introduced evidence that Alcantara, far from being merely present when his brother was arrested, was a central player in the criminal scheme. Alcantara drove to the mall with co-conspirators, distributed the counterfeit $100 bills to them, and attempted to warn the others when the police were approaching. Accordingly, testimony about the Farmington incident was not, as Alcantara contends, prior bad acts evidence subject to Federal Rule of Evidence 404(b). Rather, it constituted evidence "intrinsic" to

the criminal conspiracy for which Alcantara was tried and convicted. DeSimone, 699 F.3d at 124.

A similar analysis applies to the photographs, which depict Urias next to a table covered in currency. The government introduced evidence that the bills in the photos were counterfeit.[1] The photos were obtained from Alcantara's iPhone, along with a third image of Alcantara himself standing over a similar table of bills.[2] The pictures were all taken within minutes of each other. In these circumstances, and in light of the previously discussed evidence that Alcantara and his brother both joined in a conspiracy to pass counterfeit bills, the photographs of Urias were admissible against Alcantara to prove that conspiracy.

**4.**

Alcantara's fourth claim of error relates to a Secret Service agent's testimony that the bills depicted in the photographs discussed above were indeed counterfeit. Essentially, Alcantara argues that this testimony constituted improper lay opinion. We have held that a lay witness may provide an opinion based upon expertise that he or she "personally acquires through experience, often on the job." United States v. Vega, 813 F.3d

---

[1] Alcantara also challenges the admissibility of this testimony. We address his argument on this point separately below.

[2] Alcantara argues that the third photo was also inadmissible, but, as discussed below, this argument similarly fails.

386, 394 (1st Cir. 2016) (citation omitted). Such lay expertise must be "the product of reasoning processes familiar to the average person in everyday life." Id. (citation omitted). For example, "a police officer noticing patterns of behavior across criminal operations" who "uses straightforward logic to conclude a defendant's behavior fits within that pattern . . . does not need to be qualified as an expert." Id.

Here, the agent testified that he had previously investigated numerous cases involving counterfeit bills. In the case at hand, the agent determined that the bills depicted in the photographs were counterfeit by considering a variety of factors, including: (1) one bill was draped over a stick of deodorant, which counterfeiters often use to avoid detection;[3] (2) the ink on another bill appeared to be "bleeding," which does not happen to real bills; (3) the bills were all face-down such that the serial numbers were not visible; (4) the bills were all the same denomination; and (5) the bills all appeared new. These considerations represent precisely the type of straightforward experiential logic that this court has repeatedly found to be within the realm of permissible lay opinion testimony. See, e.g., United States v. Valdivia, 680 F.3d 33, 50 (1st Cir. 2012) (agent's

---

[3] The agent explained that counterfeiters use deodorant to coat the bills, creating a layer of substance which can make them appear genuine in the "counterfeit pen test" commonly used by retailers.

- 9 -

testimony that "based on his experience in prior drug investigations . . . traffickers often list unrelated third parties as their telephones' subscribers"); United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006) (officer's testimony that "based on his experience" Post-It notes "were likely notes of drug orders and the number '4' referred to a quantity of the drug"). Accordingly, the admission of this testimony was not plain error.

To the extent that Alcantara also generally assails the reliability of the agent's testimony, these concerns go to the "weight of the evidence, not its admissibility." See United States v. Mejia, 600 F.3d 12, 19-20 (1st Cir. 2010) (citation omitted).

### 5.

In a final claim of unpreserved evidentiary error, Alcantara argues that the court improperly admitted "flight" evidence, namely, the fact that he was arrested at JFK Airport. Such evidence is admissible so long as there is "sufficient extrinsic evidence of guilt to support an inference that [the] defendant's flight was not merely an episode of normal travel but, rather, the product of a guilty conscience related to the crime alleged." DeSimone, 699 F.3d at 125 (citation omitted). While Alcantara disputes the existence of a sufficient factual predicate, the extrinsic evidence of his guilt was substantial, highlighted by the testimony of multiple co-conspirators in both the bank frauds and the counterfeiting plot. This fact alone dooms

Alcantara's claim of plain error. See, e.g., id. (noting "overwhelming evidence" of the defendant's guilt); United States v. Otero-Méndez, 273 F.3d 46, 53 (1st Cir. 2001) (finding sufficient factual predicate based on evidence of defendant's involvement in the charged carjacking). If more were needed, the inference of a guilty conscience is further supported by the fact that Alcantara's arrest at the airport occurred just eleven days after he learned that the authorities were investigating his counterfeiting scheme.

**B.**

Alcantara raises two additional evidentiary issues on appeal, which he claims to have preserved below. Assuming that Alcantara did preserve these arguments,[4] we review the district court's evidentiary rulings for abuse of discretion. See United States v. Gemma, 818 F.3d 23, 35 (1st Cir. 2016).

---

[4] This assumption is a generous one. Indeed, with respect to the first purportedly preserved issue, namely, evidence relating to Alcantara's discussions with the undercover agent, Alcantara concedes that he only objected to the admission of the transcripts of those conversations. He did not object to the recordings or any other aspect of the agent's testimony. More broadly, the sole record evidence cited by Alcantara to establish the preservation of these issues is a one-page pre-trial motion in limine. Ordinarily, where the district court denies such a motion, the moving party must renew its objection at trial to avoid forfeiture. See, e.g., United States v. Raymond, 697 F.3d 32, 37 (1st Cir. 2012).

1.

First, Alcantara argues that testimony regarding his conversations with the undercover agent was irrelevant and thus inadmissible. This contention need not detain us long. Alcantara's first meeting with the agent, during which he expressed a desire to obtain fake licenses, occurred on January 19, 2010, just weeks after his involvement in a December 2009 bank fraud using a fake passport. On January 20, Alcantara and his confederates set in motion a second bank fraud scheme, again using false identification documents (albeit not ones provided by the agent). In the space of the following week, Alcantara had two more conversations with the undercover agent relating to (1) any contacts the agent might have at banks and (2) Alcantara's desire to obtain fake licenses. Alcantara's communications with the agent were part and parcel of the charged conspiracy, and we accordingly perceive no error. See DeSimone, 699 F.3d at 124.

2.

Alcantara's other "preserved" argument is similarly unavailing. Alcantara contends that the photograph of him standing over a table covered in currency was "irrelevant and unduly prejudicial." This argument proceeds from the flawed assumption that the government failed to introduce any "reliable evidence that the money in the picture was in fact counterfeit." As discussed above, a Secret Service agent did opine that, based on

- 12 -

his experience, the bills in the picture appeared to be counterfeit. While Alcantara quibbles with the reliability of the agent's opinion, this goes only to the weight of the evidence, not to its admissibility. See Mejia, 600 F.3d at 19-20. Indeed, as Alcantara himself points out, defense counsel conducted a robust cross-examination in an effort to undermine the agent's testimony. Unfortunately for Alcantara, the jury was not swayed. The evidence that the bills in the photograph were counterfeit dooms Alcantara's argument. At the risk of stating the obvious, a picture of the defendant with a pile of counterfeit bills is relevant to prove his involvement in a counterfeiting conspiracy.

### c.

The final arrow in Alcantara's quiver is an unpreserved claim of prosecutorial misconduct. In analyzing a prosecutor's purportedly improper statement, "we typically ask whether [that] statement so poisoned the well that a new trial is merited." United States v. Cruz-Díaz, 550 F.3d 169, 174 (1st Cir. 2008) (citation omitted). We have identified the following four factors as relevant to this inquiry: "(1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions . . . ; and (4) the strength of the evidence against the defendant." United States v. Fernandez, 94 F.3d 640 (1st Cir. 1996) (unpublished table decision), 1996 WL 469009, at *8 (citation omitted). Because Alcantara failed to

object at trial, our review is for plain error.  Cruz-Díaz, 550 F.3d at 174.

Alcantara takes issue with a few isolated sentences from the government's rebuttal argument:  "Now, the Defendant says, well, where are the insiders? . . . That's for another day.  That's for another jury.  This jury is tasked with deciding what this member of the conspiracy did, what this Defendant did."  As an initial matter, it is hardly clear that the prosecutor's statement was improper.  Of course, it is true that the jury at Alcantara's trial was tasked with assessing only his guilt, not that of any other co-conspirator.  However, Alcantara contends that the prosecutor's statement "provided false affirmation to the jury that other individuals were in fact charged for the crimes."

Proceeding from the dubious assumption that the prosecutor acted improperly, we still fail to perceive plain error.  Any misconduct that occurred was far from severe.  The statements at issue occupy a mere handful of lines in the trial transcript.  Moreover, during his closing argument, defense counsel had referred to the absence of various uncharged co-conspirators.  Accordingly, the prosecutor's comment can be read as an attempt to shift the jury's focus back to where it belonged:  the evidence against Alcantara.  Nonetheless, after making the statement at issue, the prosecutor expressed her openness to a curative instruction that her comment "was not intended to suggest whether

- 14 -

anyone else was charged." When the court offered to provide such an instruction, defense counsel expressly declined. Finally, as laid out above, the evidence against Alcantara in this case was overwhelming. In these circumstances, the prosecutor's isolated and relatively innocuous comment did not "so poison[] the well" that a new trial was required. See Cruz-Díaz, 550 F.3d at 174 (citation omitted); see also Fernandez, 94 F.3d 640, at *11 (finding no plain error where the prosecutor "erroneously stated that the testifying drug traffickers were 'either in jail or go to [sic] jail'").

## D.

We also reject Alcantara's claim that the cumulative effect of the purported errors discussed above requires a new trial. See United States v. Gaw, 817 F.3d 1, 12 (1st Cir. 2016) ("[C]umulative-error analysis is inappropriate when a party complains of the cumulative effect of non-errors." (citation omitted)).

## III.

For the foregoing reasons, we **AFFIRM** Alcantara's convictions.